199 So.2d 678

**Emmett Harold ENGLERTH**

v.

**STATE.**

**3 Div. 218.**

Court of Appeals of Alabama.

Feb. 14, 1967.

Rehearing Denied March 14, 1967.

Elno A. Smith, Jr., Montgomery, for appellant.

· Richmond M. Flowers, Atty. Gen., and Robt. F. Miller, Asst. Atty. Gen., for the State.

JOHNSON, Judge.

Appellant was indicted in two counts by the Grand Jury of Montgomery County, Alabama, for the offense of burglary and grand larceny. Accompanied by counsel, he was arraigned in open court on Novem-

ber 9, 1965, and entered a plea of not guilty. On November 17, 1965, appellant was found guilty as charged by a jury and sentenced to four years in the penitentiary as punishment therefor.

The State's first witness was Miss Carol Lollar who testified that she lived in the Richelieu Apartments in Montgomery, Alabama, and that while in Decatur, Alabama on a business trip in June of 1965, she met appellant at the Pavillion Inn where she was staying. She stated that she "fell rather hard" for him, was there a whole week, "saw him every night", and that during that week he proposed marriage to her. During July when appellant took the witness' car to have some work done on it, he had made a duplicate set of keys to her apartment in Montgomery without her knowledge. She stated that he later told her about this but that she "didn't make any issue over it" and that she "just wanted the keys back".

Miss Lollar testified that in August she and appellant had a "severe argument" in Decatur and that "in the total upset" she forgot that he had the keys but that before she left for Montgomery she remembered them and took a "heavy manila envelope and addressed it and left a note in his room and asked that he return them." In this envelope a set of keys were returned to Miss Lollar on August 18 with a letter (Exhibit No. 2) but Miss Lollar testified as to two other sets which she later found that he had retained, without her permission or knowledge; one set he gave her when she found him in her apartment and the other was found in his apartment with other things which he had allegedly taken.

The witness testified that on September 5, 1965, she returned from a trip to Florida and that she and her brother surprised appellant in her apartment. She testified as follows:

"We opened the door and when we opened the door, Harold walked out of my bedroom and Sonny was carrying my luggage for me and he walked out of the bedroom and the drawers were out and every file that I had, business papers and personal papers and everything else were strewn all over the bed. I have a personal file at home and it was all open and everything in it out, and the house was generally a mess."

Miss Lollar stated that appellant told her that he had gotten the names of all her business and personal associates and that, unless she made him a "blackmail payment" of $3,000.00 he was going to contact all of them and ruin her "professionally, spiritually, socially and personally."

No further evidence of this nature was introduced by the State except Miss Lollar continued to allude to appellant's threatening her until the day of the trial and she stated that he said, "What are you going to do if I am acquitted?".

Miss Lollar testified that missing from her apartment were stock certificates, letters, other papers and one set of cuff links worth $75.00. The cuff links were found in appellant's apartment and he admitted taking them.

Appellant then took the stand and testified that he was a pipe welder and lived in Decatur, Alabama; that Miss Lollar voluntarily gave him the keys to her apartment to use as his own; that she did not ask him to return her keys on August 18; that he had been in her apartment on August 22 and September 5, letting himself in with a replica of her key, but that she had invited him over the telephone to use her apartment and meet her there the next day. He stated that the cuff links were given to him to wear when she wore a matching necklace.

Appellant admitted taking some of Miss Lollar's personal property from her apartment when he left on September 5 and he

also admitted getting into her apartment that day with a set of keys which he had on August 18 at the time he returned the keys to her in the manila envelope and wrote "I am returning your keys. I would never have used them without your permission."

He denied wanting to marry Miss Lollar for her money but would not deny that he told his mother that he had found a wonderful thing, "a woman with some money", however he said that he didn't remember it.

Appellant admitted telling Miss Lollar that he was going to embarrass her with her family and friends. He also admitted being convicted for making obscene telephone calls and for indecent exposure. He stated that he had had his expenses paid by no woman, other than his mother, Miss Lollar and a woman from Pensacola, Florida, who, he reluctantly admitted, paid his bill of $60.00 at the Pavillion Inn where he met Miss Lollar.

On cross-examination, appellant admitted using Miss Lollar's apartment when she didn't know it.

Appellant attempted to have admitted into evidence a letter written by Miss Lollar which was unsigned and unmailed. This letter, Appellant's Exhibit No. 5, was disallowed by the court in evidence and appellant reserved an exception thereto.

■ Appellant contends that the court erred by requiring appellant's attorney to strike a jury while he had another jury still out, to which appellant excepted. We feel that the trial court did not abuse its discretion in making this requirement, with appellant being given the legal minimum of veniremen to strike from. Therefore, it was not error. Cantor v. State, 27 Ala.App. 40, 165 So. 997; Bailey v. State, 41 Ala.App. 39, 45, 123 So.2d 304, cert. den. 271 Ala. 696, 123 So.2d 310.

■ Points of Error Nos. 2, 5, 6 and 8 all deal with the sufficiency of the evidence to substantiate the verdict. After a careful study of the record, we feel that the State presented a prima facie case and that the verdict of guilty should not be contested.

Claim of Error No. 11 deals with the refusal of the court to allow appellant to introduce evidence in his own behalf, to which he made proper exception. Specifically, this refers to appellant's Exhibit No. 5, a letter (typewritten and unsigned) purportedly from Miss Lollar to another man dated August 8, 1965. This letter was purportedly a love letter and claimed to cast doubt on the truth and veracity of Miss Lollar who testified that she and appellant did not break up until August 16, 1965. Appellant states that refusal to allow this evidence prevented him from cross-examining Miss Lollar about this love affair and from advancing the theory that the alleged burglary was a ruse to "get rid" of the appellant.

We quote from the record, in pertinent part, as follows:

"Q. Did you have any discussion with him at that time as to whether he would get out of your life and leave you alone or anything similar to that?

"A. Yes, sir. The night before, Harold's entire pressure was, Number 1, that he was going to contact everybody that I knew and ruin me professionally, spiritually, socially and personally, and that he was going to contact my family. I have three—

"Q. This was at a time before you had seen any law enforcement officials.

"A. Oh, yes. Now, I have three little brothers—

"MR. SMITH: I didn't get the connection there. Did you say Harold said this?

"THE WITNESS: Those are exactly his words.

"MR. SMITH: Well, I just wanted to know. I didn't get that. I didn't know whether you thought it or he said it.

"THE WITNESS: He said it.

"MR. SMITH: All right. That's all I wanted to know. Go ahead.

"Q. Go ahead.

"A. I have three little brothers ages 9, 11 and 16, and a little sister age 13. He was going to, as he said, ruin me in their eyes because he knows that I have spent all of their lives in trying to be in their eyes what I hoped was a good older sister. I had numerous friends, several of which he had met, and the Ed mentioned in his letter was one of them. We had gone to church and he had met a pastor who was was a very good friend of mine, and he was going to contact all of them and in going through my papers he had gotten the names of the companies with which we do business and he was going to contact all of them, and it was his plan to, as he said—

"Q. Now, are you confining this as to what he said?

"A. Yes, sir.

"Q. Don't give your own interpretation of it. It has got to be as he said—

"A. I'm not.

"Q. All right. Go ahead.

"A. He said he was going to contact these people and ruin me with them unless, on Sunday night, it was that I arranged a three thousand dollar blackmail payment. When my mother was over there for an hour, she begged and pleaded with Harold to leave. She told him that what he was proposing was blackmail and he said that it was money that would be required for him to pay his bills and he said too, maybe leave the country and get him a Senorita.

"Q. Well, now, did you call the police?"

"A. No, sir. I couldn't afford to.

"Q. Did he leave town on Monday morning?

"A. Yes.
"Q. When did you hear from him again, if you did hear from him again?

"A. I had heard from him that night. I talked to him in Decatur that night and, in fact, I called him in Decatur that night to see how his pulse was running and what he was going to do. He had left with the idea of—

"MR. SMITH: We object to how his pulse was running.

"THE WITNESS: I'm sorry. I wanted to see what he had to say, in other words.

*"BY MR. FRANK W. RIGGS: (Continuing)*

"Q. Go ahead.

"A. Well, he left with the idea that there would be an attempted reconciliation which, of course, was a bid for time until I could figure out what to do because I had a family, a job and a lifetime of friends at stake.

."Q. All right. Did you hear from him anymore?

"A. Constantly. I have letters and—

"Q. Well, now, I mean, did you hear from him on Tuesday?

"A. It was Tuesday a week after that.

"Q. You went a week without hearing from him?

"A. No, sir. I heard from him all the time. All the time. I would say probably once a day by phone or otherwise during that time, and then on the Tuesday following, which was on September 15, I believe, he called me at my mother's and father's, and by this time—

"Q. Well, wait just a minute now. I want to get it clear about this call. I want you to tell the jury exactly the sequence of events on this particular telephone call.

"A. All right. He called—

"MR. SMITH: Now, Your Honor, we object to all of this part with reference to the blackmail but just for the benefit of this jury, we are going let it go in—

"MR. RIGGS: Well, if you object to that then I will withdraw it.

"MR. SMITH: I am going to let you put it all in.

"MR. RIGGS: Well, you objected to it and I withdraw it.

"MR. SMITH: Well, I just want you to know that I'm not happy with it but—

"THE COURT: Now, wait just a minute! This Court will entertain formal objection but I want no side remarks by counsel.

"MR. SMITH: Your Honor, we object to the introduction of evidence in the blackmail case.

"MR. SMITH: All right, then. I will withdraw it.

"THE COURT: Proceed."

Nowhere in the record do we observe an unequivocal objection to such testimony. We hold that there was no reversible error. The letter in question was not shown to have been written by Miss Lollar or delivered and had no probative value in regard to the crimes of burglary and larceny, even to show bias against the appellant. For all these reasons the letter was properly refused by the court. Mobile Cab and Baggage Co. v. Busby, 277 Ala. 292, 169 So.2d 314.

We have given careful consideration to each of the errors charged, have carefully studied the record in its entirety and do not feel that there was error committed by the trial court.

This cause is due to be and the same is hereby

Affirmed.

PRICE, P. J., and CATES, J., concur in result.