HARRIS, Presiding Judge.
Appellant was convicted of rape and the jury fixed his punishment at ten years imprisonment in the penitentiary. The Court ordered the sentence be served at the expiration of a sentence appellant was serving in the State of Georgia.
Appellant did not testify in his behalf. He offered testimony in an attempt to discredit the testimony of the prosecutrix that she had been crying. The State produced a witness who testified that he saw the prose-cutrix the morning of the rape and she appeared to have been crying and was real nervous.
After sentence was imposed appellant gave notice of appeal. He was found to be indigent and was furnished a free transcript. New counsel was appointed to represent him on this appeal.
The prosecutrix testified that in April, 1974, she was twenty years old and that she lived at home with her mother and two sisters. On April 27, 1974, a Friday night, prosecutrix left home at approximately 11:35 p. m. and drove across Birmingham to visit a friend. While traveling down First Avenue North, prosecutrix saw a rust or red colored Mustang automobile, and at trial she identified appellant as the driver. The prosecutrix further testified that, when she stopped at a traffic light, she glanced over and saw appellant looking at her.
Prosecutrix’s destination was an apartment building on Tuscaloosa Avenue and Ensley Avenue. When she arrived there, prosecutrix saw appellant drive up behind her and park. From the record:
“Q. What is the next thing that happened, please, ma’am?
“A. I parked my car and got out. And at the same time he got out of his car. And I asked him what did he want. And he said that I looked at you and you looked at me. So, I thought maybe you wanted to go get a drink. And I said no. “And I took the door to knock on the door, and then he grabbed me.”
At that time appellant pulled the prose-cutrix around the side of the apartment building, telling her that, “If you make a sound I’ll split your throat.” The prosecu-trix testified that she then felt the cold steel of a knife on her throat. When appellant asked for a kiss and placed a hand between her legs, prosecutrix told him that it was no use because she was in her menstrual cycle. Appellant, holding the prose-cutrix by her arm, told her, “Well, we will find out,” and walked her to his car. Appellant told the prosecutrix to get in the *125 back seat of the Mustang and lie down. Appellant backed out of the parking lot and drove twenty to thirty minutes.
The prosecutrix testified that the appellant stopped in the yard of a house under construction in a neighborhood which she later discovered was in Hoover, in Jefferson County. Appellant told the prosecutrix, “Okay, you can get out now,” and they walked to the front of the car. Then appellant ordered the prosecutrix to disrobe and she stripped to her panties. Having been ordered to lean over the hood of the ear, the prosecutrix complied and the appellant struck her across the buttocks five or six times with his belt. Appellant told the prosecutrix, “That’s because you lied to me.” The prosecutrix explained that there was no evidence that she was in her menstrual cycle.
The prosecutrix testified that she and appellant then went to the utility room of the house; she did not see a knife at this point. Appellant brought in a large piece of cardboard and told the prosecutrix to sit down. Appellant then offered the prosecu-trix a cigarette, which she accepted, and they began to talk. When the prosecutrix told appellant she was cold, he went to the car and brought a coat for her. From the record:
“And we talked some more. And then he told me to lay back on the cardboard. And after I had taken the coat off he tried to have sex with me, but couldn’t, because I kept my legs straight.
“Q. What did he say at that time?
“A. He told me to get up. And he pulled me on top of him.
“Q. Now, did you have your panties on at this point?
“A. No, sir.
“Q. And what did you do, if anything?
“A. I was on top of him.
“Q. Okay. Did he penetrate you with his private parts?
“A. Yes, sir.
“Q. All right. What happened next?
“A. We got up and had another cigarette.
“Q. Do you recall whether or not he had a climax?
“A. Not then.
“Q. All right. After that act took place, what happened next, please, ma’am?
“A. We lit another cigarette. I asked him could I get dressed, and he said yes. He said, T believe it’s time to get you back.’ ”
When appellant and the prosecutrix got back in the car, it would not start, the headlights having been left on while they were at the house. The car rolled over a curb and the prosecutrix and appellant rocked the car off of the curb, sending it rolling down a hill where it hit a tree.
Appellant took the prosecutrix by the hand and told her they were going for help. Seeing a lighted house down the street, they walked over to it and knocked on the door. When a man answered the door, appellant told him that they had had car trouble and needed help. Appellant was told that help would be called.
The prosecutrix further testified that she did not tell the man that she had been raped. Appellant and the prosecutrix then sat down on the front steps of the house and waited. Instead of a wrecker pulling up, a police car arrived and appellant told the prosecutrix to “be quiet and not say a word.” When the prosecutrix asked the appellant if he still had the knife, he replied that he did. From the record:
“The police drove up and asked what was the trouble.
“Q. And then what took place?
“A. Do what?
“Q. Then what took place?
“A. We got in the car with the policemen and showed the policemen where the car was.
“Q. When you got in with the policemen did you get in the front seat or in the back seat?
“A. The front seat.
“Q. Okay. Did you tell the policemen that you had been raped?
“A. No, sir.
“Q. Okay. Go ahead.
*126 “THE COURT: Speak up a little louder. You said what?
“A. No, sir.
“Q. All right. Go ahead.
“A. We drove down to where the car was and got out. And he walked down to the Mustang with me to tell me to sit there. And then he walked back and talked with the policemen.
“And I suppose the police called the wrecker, because the wrecker came. And another police car then came. The first police car left. Then the second police car left.
“The wrecker came down to where the Mustang was. And the defendant knew the man that was driving the wrecker. They talked to each other.
“We pulled the Mustang out in the road and tried to get it to run, but it was out of gas. The man who drove the wrecker tied the muffler up to the side door, but that didn’t help, because the lights had been on and it was out of gas. The man driving the wrecker offered to take the defendant to his house because it was close by. They figured that we had been parking.
“So, we got in the wrecker and drove to their house. I asked the man that drove the wrecker something about cars. And he gave me one of his cards. I in turn gave it to the police.
“Q. Did you tell the man that drove the wrecker that you had been raped?
“A. No, sir.”
On the return trip to her car, appellant stopped at a store to get some cigarettes. The prosecutrix remained in the car. As they approached the apartment complex, prosecutrix told appellant that he need not take her all the way back to her car. In case the police were there, appellant was to let her out a block away from the apartment.
Appellant did let the prosecutrix out of the car in an alley near the apartment, and she ran to her friend’s apartment. After a conversation with her friend, a “guy that I was dating,” police arrived and the prosecu-trix was taken to Mercy Hospital approximately 5:00 or 5:30 in the morning, April 28, 1974.
Leonard Robbins testified that he was a policeman for the City of Birmingham and that on April 28,1974, his duties were those of an evidence technician. That day, Officer Robbins went to Mercy Hospital where he took several photographs of the prosecu-trix, depicting strap-like bruises across her buttocks. These photographs were admitted into evidence.
Ronnie Stanford testified that on April 29,1974, while he was working in the Homicide Department, he had a conversation with the prosecutrix. Following this conversation, a warrant was obtained for the arrest of appellant. Appellant was arrested on May 7, 1974.
At this point the State rested. There was no motion to exclude the State’s evidence.
Sarah Johnson testified that she was the mother of the appellant. In the early morning hours of April 28, 1974, appellant came home, bringing a girl, the prosecutrix, with him. The prosecutrix was not crying, nor did she appear to have been crying. The girl’s eye makeup was not smeared. Nor was her hair in disarray. Her clothes were in order. Mrs. Johnson further testified that they told her that they had had car trouble.
Sergeant John Ray testified that he was employed by the Hoover Police Department. On April 28, 1974 Ray responded to a call that a couple was having car trouble. Arriving at the home of a Mr. Bradley on Laredo Drive, Ray found appellant and the prosecutrix standing on the front porch with Bradley. From the record:
“Q. What did ya’ll do at that point?
“A. They told me that their car was stuck in a driveway down the street, which is a steep hill from Mr. Bradley’s house.
“We got my patrol car and went down to where this car was stuck in the driveway.
*127 “Q. Now, was that front porch lighted? “A. Yes, sir, it was.
“Q. Did you have an opportunity to observe the young lady?
“A. Somewhat, yes, sir.
“Q. Do you recall what she was wearing?
“A. No, sir.
“Q. Did you observe or can you recall her appearance?
“A. Not that clearly, no, sir.
“Q. Was there anything to her appearance that was so out of the ordinary that your attention was directed to it?
* * * * * *
“A. I don’t recall seeing anything out of the ordinary.
“Q. All right. So, did you have any conversation with the young lady?
“A. Not that I recall, no, sir.”
When Ray, prosecutrix and appellant arrived at the Mustang, the prosecutrix went straight to the stalled car and got behind the wheel. Ray and appellant were unable to get the car out of the ditch, so Ray called a wrecker. The prosecutrix remained in the Mustang until the wrecker arrived. Ray made no report of the incident.
W. L. Waldrop testified that he was employed by the Hoover Police Department and that he was on duty in the early morning hours of April 28, 1974. Waldrop responded to the same call as had Ray and found Ray already on the scene. Waldrop recognized appellant and asked him if he were by himself. The appellant responded, no, and told Waldrop that his girl friend was inside the Mustang. At that time Wal-drop noticed the prosecutrix. After the wrecker pulled the car out, Waldrop left the scene. He took no action based on the prosecutrix’s appearance.
Douglas M. Purser testified that he was self-employed and ran Purser and Watkins Wrecker Service. Purser testified that on April 28, 1974, he pulled appellant’s car out of a ditch in Hoover, Alabama. The prose-cutrix was sitting in the car at the time. At some point Purser saw a knife in a scabbard stuck down by the console of the car. Purser further testified that he drove appellant and the prosecutrix to appellant’s home. On the trip there, the prosecutrix asked Purser if he worked on car headlights and Purser answered that he did, giving her a business card which she gave the police later. Purser further testified that appellant gave him a bad check and that he thought he should have made the check good.
On cross-examination Purser testified that the prosecutrix appeared to have been crying. From the record:
“Q. Was her appearance such that you would — that you were of the opinion that something was out of the ordinary?
“A. She acted like she was upset. And I made the statement that it was awful late at night to be out looking at new homes. And he replied yeah, it is rather late. And as far as her reply, she didn’t have any.
“Q. She didn’t say anything, right?
“A. She didn’t say anything.
“Q. The whole time?
“A. Other than when she asked me about a card.
“MR. DONAVAN: Okay. That’s all.”
Mrs. Johnson was then recalled. She testified that when appellant left her home to take the girl home, he was gone fifteen minutes. She further stated that appellant did not carry a knife of any kind.
Appellant then recalled the prosecutrix. She testified that she returned to the apartment on Ensley Avenue about 5:00 a. m. The prosecutrix did not remember seeing a knife after she and appellant first got out of the car at the house where the incident occurred. She told the police that the weapon was “probably” a hunting knife. The prosecutrix did not remember the route appellant took from his home to the apartment where her car was left.
*128 After the verdict was returned, and judgment passed, appellant filed a motion for new trial, which the court denied. Among the grounds stated were: (1) that the verdict was against the weight of the evidence, (2) that the trial court refused to allow the witness Purser to be treated as hostile, and did not allow a recess for the witness to be located, (3) that the trial court erred in refusing to give the oral charge as requested.
Appellant contends in brief that he was surprised by the testimony of the witness Purser that he saw a knife in appellant’s car. It does not appear that appellant raised this point at the time he asked that he be allowed to treat Purser as a hostile witness. Rather, appellant specifically stated that he was concerned about which party was the last to leave the scene when appellant’s car was pulled out of the ditch by Purser’s wrecker. That point was correctly considered immaterial by the trial court. It is not error to refuse to allow a party to impeach a witness on a fact which is immaterial. Gamble, McElroy’s Alabama Evidence, 3rd Edition, Section 156.01(5).
As to the trial court’s failure to allow a recess to recall Purser, no error resulted. First, appellant did not request a recess to locate the witness. Secondly, appellant stated that he would impeach Purser, not by prior inconsistent statements of the witness, but through the testimony of other witnesses. Thus, Purser’s presence in court was not required for this method.
At the conclusion of the court’s oral charge, the following occurred:
“What says the State?
“MR. DON AVAN: The State is satisfied.
“THE COURT: What says the Defendant?
“MR. LEDBETTER: We are not satisfied, Your Honor.
“THE COURT: All right.
“MR. LEDBETTER: Shall I approach the bench?
“THE COURT: Well, either way. What would you like?
“MR. LEDBETTER: Well, I would like the jury to be charged, first of all, on the degree of resistance required—
“THE COURT: On what?
“MR. LEDBETTER: On the degree of resistance required of the woman.
“THE COURT: Do you have any charges prepared that you would like for me to read?
“MR. LEDBETTER: Not a specific charge, Your Honor, on that point.
“THE COURT: All right.
“MR. LEDBETTER: And secondly, I would like for the jury to be charged as to the weight of — the weight that should be given to the evidence; that they should consider the demeanor of each witness, that if they should find that a witness is not telling the truth on a material fact that they may believe or disbelieve the witness’ testimony entirely.
“THE COURT: Have you prepared a charge for me that you would like for me to give?
“MR. LEDBETTER: No, sir, I haven’t. I would just request those usual type charges.
“THE COURT: I will read something else pertaining to rape.
“Force overcoming the resistance of a woman is an indispensable element in the offense of rape. It is sufficient if it was a constructive force, such as duress or being put in fear of personal injury or violence.
“A lack of consent on behalf of the woman to sexual intercourse is one of the elements of the offense of rape. Consent obtained by duress or fear of personal violence is not consent within the meaning of the law. The consent of a woman yielded at any time before the act of penetration was completed is a valid defense.
“Now, if you believe that any witness has willfully testified falsely as to a material matter in the case or has sworn falsely as *129 to any material matter in the case, then in your discretion you may disregard all or any part of that witness’s testimony. These are matters for you to work out in your sound discretion in arriving at a true verdict.
“You take into the jury room your common sense and common knowledge of every day affairs of men. And you are expected to use that common sense and common knowledge in arriving at a just verdict.
“MR. LEDBETTER: I would like that they be charged that the woman must offer a reasonable degree of resistance under the circumstances.
“THE COURT: Do you have any charge that you want me to give written out?
“MR. LEDBETTER: No, sir. I don’t have it written out.
“THE COURT: All right. Overruled. Anything else?
“MR. LEDBETTER: No, sir.
“MR. DONAVAN: You mean you have denied to give that charge?
“THE COURT: What?
“MR. DONAVAN: You have refused to give that charge?
“THE COURT: Yes. Unless he has one written out. I have given the law on rape.
“MR. LEDBETTER: Do I have time to write it?
“THE COURT: No. Unless you have already written—
“MR. DONAVAN: I would object to that.
“THE COURT: Not unless you have it written out now.”
It is true that the trial court cannot fix any particular time during the trial on which written charges must be presented. Smith v. State, 51 Ala.App. 527, 287 So.2d 238, cert. denied, 292 Ala. 750, 289 So.2d 808; Core v. State, 50 Ala.App. 533, 280 So.2d 794, cert. denied, 291 Ala. 776, 280 So.2d 797. However, in Coatney v. State, 49 Ala.App. 385, 272 So.2d 593, a similar error was complained of and this Court stated that since no written charges were present in the record it would be necessary to resort to “speculation to guess” what the tendered charges said. This issue is not preserved for review.
Appellant contends that the trial court erred in allowing the following question to be answered.
“Q. And what was he referring to, in your opinion?
“MR. LEDBETTER: I object to the phrasing of that question. I object to the phraseology of that question.
“THE COURT: You are asking Miss Coleman what he was referring to? Is that the question?
“MR. DONAVAN: Yes, sir.
“THE WITNESS: Back in the alley when I told him that I was on my period. And there was no evidence that I was.”
Appellant argues in brief that a person is precluded from testifying that another person knew a certain fact or that another felt a certain way. This issue was not preserved for review. A specific ground of objection waives all other grounds. Alabama Digest, Criminal Law, «=>695(5).
Finally, appellant contends that the evidence is not sufficient to sustain his conviction for rape. He specifically points to the opportunities that prosecutrix had to make a complaint, when she remained silent. Although a failure to make a timely complaint after the rape may cast doubt on the veracity of the prosecutrix’s testimony, it does not disprove the charge. The truth of the, charge remains for the jury. Clark v. State, 28 Ala.App. 448, 186 So. 778. As seen from the facts set out above, the testimony of prosecutrix, alone, if believed by the jury, was sufficient to sustain appellant’s conviction. Even the uncorroborated testimony of a prosecutrix will support a rape prosecution. Daniels v. State, Ala.Cr.App., 343 So.2d 566.
*130 A careful search of the record reflects no error injuriously affecting the substantial rights of the appellant. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.