The defendant was indicted for the first degree murder of Robert C. Tate in a killing connected with an independent trucker's strike. A jury convicted the defendant of second degree murder and fixed sentence at thirty years' imprisonment.
 I
Although the evidence is wholly circumstantial, it is sufficient to support the jury's finding that the defendant was guilty beyond any reasonable doubt.
The homicide occurred during the early morning of June 20, 1979, on Highway 72 near Tuscumbia. Shortly after midnight, a small number of men gathered outside the defendant's trailer. They were "carrying on" and drinking beer. Several of the young men present carried some old truck parts to the edge of the highway and attempted to throw them at passing trucks. Witnesses for the State testified that the defendant made statements that the striking truckers were not doing enough to help themselves, that "they were going to need some help from just plain country folk" and that "the [independent] truck drivers weren't doing enough to stop the trucks from — that it was going to take someone *Page 1235 
else to show them that we really mean business." One witness stated that the defendant said that "he had something in the house that would shoot a radiator out or something."
After the defendant made these statements, he entered his trailer and returned with a lever-action rifle and a pistol. There was general talk of "going up and shooting some trailers and tires." One witness testified that the defendant was talking about shooting in fuel tanks. Several witnesses testified that the defendant cautioned to be sure and not hurt anybody.
Eyewitness testimony proved that the defendant and three other men went to the edge of a field near the highway. The defendant, with the lever-action rifle, and Roger Fuller, with a pistol, actually fired at several passing trucks. The defendant fired the last shot and then "it sounded like [a truck] was pulling off the side of the road." There was evidence that one truck other than the deceased's was struck by bullets — while traveling in the same general area of Highway 72 and very close to the time when the deceased must have been shot according to the State's evidence.
The State proved that Robert Tate died from a single 30.30 caliber bullet fired from a 30.30 caliber Winchester lever-action rifle. The bullet entered the cab of Tate's truck right under the driver's windshield wiper and tore into his left leg. The severing of an artery and major vein caused massive bleeding which resulted in Mr. Tate's death.
In reviewing a conviction based on circumstantial evidence, this Court must view that evidence in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871, 874
(Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (1979). In stating the facts in this opinion, we have omitted some facts which would tend to mitigate the defendant's guilt; yet we have also omitted other facts which tend to implicate him. We have only attempted in our brief sketch of the State's evidence to show that there exists a reasonable theory from which the jury could have concluded that the defendant was guilty. Cumbo, 368 So.2d at 875. After carefully reviewing the evidence, we can only conclude that the jury's verdict is authorized and supported by the evidence. In the weight to be given evidence "courts and juries must use common sense, common reason, and common observation of the usual acts of men and women under given circumstances." Thompson v. State, 21 Ala. App. 498, 499,109 So. 557 (1926).
 II
The defendant argues that the trial court erred when it refused to permit him to impeach the testimony of Roy Dean Morris by showing, contrary to Morris' testimony, that Morris had seen or owned a certain stolen pistol.
Outside of the jury's presence, the defendant proved that in July of 1976 a .22 caliber pistol and a 30.30 caliber lever-action Winchester rifle were stolen from the residence of Sonny Barfield. This burglary was never solved. Ray Shikle, who originally traded the pistol to Barfield, testified that in November of 1976, about four months after the burglary, he saw the same pistol in the possession of Roy Morris. Under cross examination Morris denied any knowledge of the stolen pistol.
Whether Morris was ever in possession of the particular stolen pistol is of no probative value in determining the guilt or innocence of the defendant. It is not even contended or alleged that the stolen pistol or rifle was in any way connected with Mr. Tate's death. The defendant sought to prove that Morris was in possession of the stolen pistol in November of 1976. The murder occurred in June of 1979 but there is no contention that Morris still had the pistol. Considering all the circumstances, the possession of the pistol is so remote in time from the crime that its relevance and materiality rest in conjecture and speculation. White v. State, 380 So.2d 348, 350
(Ala.Cr.App. 1980).
Refusing to allow a defendant to impeach a witness on an immaterial matter is not error. Johnson v. State, 365 So.2d 123
(Ala.Cr.App.), cert. denied, Ex parte *Page 1236 Johnson, 365 So.2d 130 (Ala. 1978). Eliciting immaterial testimony from a witness and then calling another witness to dispute the immaterial matter is improper impeachment. Weeks v.State, 346 So.2d 1181 (Ala.Cr.App. 1977); Kilpatrick v. State,51 Ala. App. 352, 285 So.2d 516, cert. denied, 291 Ala. 628,285 So.2d 525 (1973); Englerth v. State, 43 Ala. App. 663,199 So.2d 678, cert. denied, 281 Ala. 720, 199 So.2d 682 (1967); C.Gamble, McElroy's Alabama Evidence, § 156.01 et seq. (3rd ed.1977). For these reasons, the action of the trial judge wasproper.
 III
The defendant next contends that the trial court committed error in refusing to allow a land surveyor to testify to the results of tests he made concerning the angles and heights a bullet would enter a truck from an area where footprints were discovered near Highway 72 where the deceased's truck left the road.
The defendant had a land surveyor go to the area of the crime, set his transit at three different positions and measure the path, angle and distance a bullet fired from each of those positions would travel and strike a truck traveling on the highway. The trial court allowed the testimony on the surveyor's tests and calculations at two positions at and near an "Army" billboard or sign near the highway. There was testimony that the defendant shot at the trucks in a location immediately next to this sign. This was the first position tested. Near this same sign, two 30.30 caliber rifle shells were found. This was the second position tested. The third position was in a ditch located on a bank of Highway 72 in an area where some footprints had been found. The significance, if any, of these prints was never established and there was no evidence to show that any shot was ever fired from this position.
Using the figures contained in a report of the state toxicologist, the surveyor concluded that bullets fired from each of the first two positions would not have entered the truck within the range of maximum and minimum angles stated in the report. However, the surveyor stated that a shot fired from the third position would have been within estimations of the report.
The State objected to the admission of the results of the calculations from the third position because it was on a hypothesis "without any factual basis." The trial judge sustained this objection finding that "the question[s] asked are based on facts not in evidence in this case."
A properly qualified expert may testify to the trajectory or the direction from which a bullet was fired, Ivey v. State,369 So.2d 1276, 1280 (Ala.Cr.App.), cert. denied, 369 So.2d 1281
(Ala. 1979). While the State did not object to his qualifications, the surveyor was not qualified as a ballistics expert or even as one competent to testify to the trajectory of a firearm projectile. He was not initially qualified to any degree on the study of the dynamics and flight characteristics of projectiles. He readily admitted that he never observed the truck which the bullet struck. His findings were based on the opinions and findings of the state toxicologist which by the toxicologist's own admissions were mere approximations and speculations.
Since the surveyor did not have firsthand knowledge of the data upon which his opinions were sought, that data had to be specified to him in a hypothetical question. McElroy, § 130.01. The rule is that a hypothetical question asked of an expert cannot be based upon facts which are not in evidence. McElroy, supra.
 "[A]n expert may give an opinion upon relevant matters under inquiry and he may base that opinion solely upon a hypothetical question without any personal knowledge of the matter inquired about. The hypothetical question should properly embrace only the facts in evidence and not certain matters as to which there is no evidence tending to support it. Rational inferences that may be drawn from testimony, as well as the positive and direct testimony itself, may form the basis for the question. Where the expert is not acquainted with the facts, which are *Page 1237 
in dispute, he may not express an opinion, but may be examined hypothetically." White v. State, 294 Ala. 265, 272, 314 So.2d 857 (1975).
However, even an expert may not testify as to the relative positions of the parties before a shot is fired. White,294 Ala. at 272, 314 So.2d 857; Ivey, 369 So.2d at 1280.
Since there was no evidence that any shot was fired from the third location, the surveyor's testimony on this position was not based on facts in evidence. See Sherrill v. State, 138 Ala. 3,35 So. 129 (1902). Only speculation and conjecture support the assumption that the fatal bullet was fired from the third location. Consequently, the action of the trial court in refusing to allow his testimony on this matter was proper.
Moreover, we note that the defendant submitted evidence, which, if believed, tended to prove that the fatal shot was not fired from either location the State's evidence supported. Having proved where the shot was not fired from, the defense could logically argue that it must have come from some other position.
 IV
The question as to the validity of a search is a legal question for the trial court to determine on evidence heard in camera. Crowden v. State, 55 Ala. App. 325, 330, 315 So.2d 122, cert. denied, 294 Ala. 756, 315 So.2d 128 (1975). Once the State proved the legality of the search and seizure before the trial judge, it was not necessary to present that same predicate to the jury.
 "Where the admissibility of the evidence depends on the legality of its seizure or other manner of procurement, the question whether it was legally obtained is ordinarily for the court. Thus it is generally for the court to say whether there was probable cause for the issuance of the search warrant under which the evidence was seized, whether the warrant and affidavit were valid, whether the premises searched were the premises described in the warrant, whether accused was lawfully arrested so as to render admissible evidence obtained as a result of the arrest, whether there was probable cause for an arrest without warrant or a search without warrant, whether consent to a search without a warrant was given, and if given whether it was lawful, or whether a search without warrant was unreasonable or illegal.
 "Evidence offered in support of motions for the return of evidence and suppression of evidence need not be submitted to the jury since such motions are for the consideration of the court alone; . . ."
23A C.J.S. Criminal Law § 1134b (1961).
The holding of Lewis v. State, 295 Ala. 350, 329 So.2d 599
(1976), that the State must prove the "Miranda" and "voluntariness" predicates before the jury is not analogous.
In addition to answering every question raised on appeal, we have searched the record for error and found none. The judgment of the Circuit Court is affirmed.
AFFIRMED.
All Judges concur.